IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RONALD A. WILLIAMS,                    )
              Petitioner,          )
                                   )
              vs.                  )          Civil Action No. 98-1320
                                   )
LOUIS FOLINO Superintendent, SCI-      )
GREENE,                                )
              Respondent.          )

<u>MEMORANDUM OPINION</u>

Petitioner Ronald A. Williams, who is currently an inmate at the State Correctional Institution at Greene, Pennsylvania, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on August 6, 1998, challenging his conviction on January 24, 1985 in the Court of Common Pleas of Butler County, Pennsylvania, on charges of first degree murder and related offenses and the sentence of life imprisonment and a consecutive term of five to ten years, imposed by the trial court on August 11, 1989 following his appeal to the Pennsylvania Supreme Court, which reversed the death sentence originally imposed by the trial court on June 27, 1985. <u>Commonwealth v. Williams</u>, 561 A.2d 714 (Pa. 1989). The charges against Petitioner and his brother and co-defendant, Raymond Williams, arose out of the shooting death of Archie Bradley, a truck driver, who was killed in the Norsub parking lot in Cranberry Township on August 5, 1984. Pending before the Court is Petitioner's motion to amend the petition.

In the petition, he presented many claims of trial error, including two claims of jury bias: 1) that the trial court denied him his right to self-representation when a juror stated that he had received ex parte information of Petitioner's criminal record from the district attorney and an alternate juror stated that he had received similar ex parte information from a prosecution team police officer (i.e., the jury overheard information that he and Raymond were involved with

murders committed in Michigan); and 2) that he was denied a full and fair hearing in his Post

Conviction Relief Act (PCRA) proceedings[1] where the state courts failed to allow him to raise

the disingenuousness of the jurors on voir dire, where they denied having racial bias but some of

them referred to Petitioner, his brother and black people as "niggers" and to other jurors as

"nigger lovers" outside of the jury room and then stated that "all niggers do is cause trouble" and

then carried this bias into their deliberations which denied him a trial by a fair and impartial jury.

(Pet. ¶¶ 13-14.)[2]

On February 28, 2000, a report and recommendation was filed by Magistrate Judge

Sensenich (Docket No. 19), which recommended that the petition be denied.  With respect to

these two claims, the report and recommendation stated as follows: 1) as to the claim of an

external influence on the jury, the Pennsylvania Supreme Court had adjudicated this claim on the

merits, determined that the information was not given to the jury until after the guilt phase of the

trial had concluded and provided a remedy by reducing Petitioner's sentence to life

imprisonment; and 2) as to the claim of racial bias on the jury, the state courts had concluded

that Petitioner could not support this claim by means of juror statements because of the "no-

impeachment rule" and this conclusion was not contrary to or an unreasonable application of

Tanner v. United States, 483 U.S. 107, 117 (1987), and other relevant Supreme Court cases.  The

report and recommendation was adopted by Judge Ziegler and the case was closed on June 27,

---

[1]Petitioner had filed his first PCRA petition on January 21, 1994 and a hearing was held on July 18, 1995.  The petition was denied on December 5, 1995 and the PCRA court's order was affirmed by the Superior Court on November 14, 1996.  The Pennsylvania Supreme Court denied his petition for allowance of appeal on August 11, 1997.

[2]Docket No. 1.

2

2000 (Docket No. 26).  Petitioner filed a motion for reconsideration (Docket No. 27), which was denied by Judge Ziegler in an order dated July 11, 2000 (Docket No. 28).

On August 4, 2000, Petitioner filed a notice of appeal (Docket No. 29) and on May 17, 2002, the Court of Appeals for the Third Circuit granted him a certificate of appealability limited to two questions: was he denied due process in violation of the Fourteenth Amendment or a fair trial or impartial jury in violation of the Sixth Amendment because (1) jurors were disingenuous on voir dire in answering questions about racial bias; or (2) is this a rare case which is an exception to the "no-impeachment rule"?  (Docket No. 30.)  On October 1, 2003, the court issued a judgment that affirmed in part and reversed in part this Court's order and remanded the case for an evidentiary hearing (Docket No. 32).

The opinion, dated September 9, 2003, was published as Williams v. Price, 343 F.3d 223 (3d Cir. 2003).  The Court of Appeals affirmed this Court's conclusion that the jury received the information about other criminal activity after the guilt-phase of the trial had ended and that the Pennsylvania Supreme Court had already provided Petitioner with a remedy.  Id. at 235.

The court parsed the claim of racial bias on the jury more finely.  It held that the PCRA court did not violate clearly established federal law by excluding evidence as presented in an affidavit by Juror Judith Montgomery that she had heard racist remarks[3] by other jurors based on the "no-impeachment rule."  Id. at 235-39.[4]

However, Petitioner also had presented the affidavit of Jewel Hayes, a trial witness, who

_____

[3]Montgomery stated that other jurors called her a "nigger lover" and made remarks such as "I hope your daughter marries one of them," and "If you don't give him the death penalty, I hope the next trucker will be your father."  (Docket No. 52 Ex. C.)

[4]A more detailed report of the court's discussion of this issue appears below.

stated that, after the trial concluded, she encountered Juror Number Two in the lobby of the courthouse and he made racial remarks to her.[5]  Because Hayes was not a juror, the remarks were made in a public place and they had no connection to the jury deliberations, the Court of Appeals held that her affidavit was not excluded by the "no-impeachment rule."  Moreover, because the PCRA court simply excluded Hayes's affidavit and did not make specific findings that Petitioner failed to produce her, that her testimony was not credible or that Juror Number Two had spoken truthfully on voir dire, the Court of Appeals concluded that the state court had unreasonably applied clearly established federal law, namely that a state evidence rule may not severely restrict a defendant's right to put on a defense if the rule is entirely without any reasonable justification.  Id. at 232, 234.  The court remanded the case "for an evidentiary hearing at which Williams has the opportunity to make the showing mandated by McDonough."  Id. at 239.[6]

Upon remand, Petitioner began making requests to raise new issues.  His first request was denied following a status conference before Magistrate Judge Sensenich in an order dated February 24, 2004 (Docket No. 38).  He filed a motion for reconsideration (Docket No. 42) on April 22, 2004 and it was denied by the undersigned on April 29, 2004.[7]  On April 29, 2005, Petitioner (now represented by Lisa Freeland, the Federal Public Defender),[8] filed a motion for

_____

[5]Hayes stated that Juror Number Two said "All niggers do is cause trouble" and that she "should go back where [she] came from."  (Docket No. 52 Ex. D.)

[6] McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984), holds that a party will be entitled to a new trial if he can demonstrate that a juror failed to answer honestly a material question on voir dire and further that a correct response would have provided a valid basis for a challenge for cause.

[7]The case was referred to the undersigned on April 6, 2004 (Docket No. 41).

[8]Attorney Freeland was appointed to represent Petitioner in an order dated March 19,
(continued...)

4

leave to amend the petition (Docket No. 52), but before the Court could rule on it, Petitioner

filed a motion to stay proceedings so that he could exhaust his state court remedies (Docket No.

56), which was granted in an order dated July 27, 2005 (Docket No. 57).  On September 22,

2005, the undersigned entered an order dismissing Petitioner's motion to amend without

prejudice to be refiled after completion of state court proceedings and the lifting of the stay

(Docket No. 58).

Petitioner was concerned about the running of the statute of limitations and requested that

the Court instead stay all pending motions.  On November 30, 2005, Judge Cercone[9] entered an

order rescinding the September 22, 2005 order, closing the case statistically and staying all

pending motions until such time as Petitioner exhausted his state court remedies and filed a

motion to reopen (Docket No. 62).

On April 18, 2008, Petitioner filed a motion to reopen the case (Docket No. 63) and the

case was reopened on April 24, 2008 (Docket No. 64).  The Butler County District Attorney

withdrew from the case because of a conflict and Jennifer Buck of the Attorney General's Office

entered her appearance on behalf of the Respondent on October 1, 2008.[10]  During a telephone

status conference on December 29, 2008, dates were set for the Respondent to file an answer to

the "amended petition" and for the parties to file further briefs prior to an evidentiary hearing.

---

[8](...continued)
2004 (Docket No. 40).

[9]Judge Cercone was assigned to the case upon the remand from the Court of Appeals, on
October 8, 2003.

[10]By orders of Court dated June 1, 2009 (Docket Nos. 83, 84), Louis Folino
(Superintendent at SCI-Greene) was substituted for James Price (Superintendent at SCI-
Pittsburgh) and the Attorney General was removed as a party respondent.  Thus, the only
remaining respondent is Superintendent Folino.

Because of the convoluted history of the case, no one raised the issue that Petitioner's motion to amend the petition that had been filed on April 29, 2005 remained pending.  However, in preparing a response, Respondent realized that the motion had not been ruled upon and on April 2, 2009, he filed a second response to the motion to amend, in which he presented three arguments as to why the Court should not permit Petitioner to amend the petition or expand the scope of the evidentiary hearing from what had been ordered by the Court of Appeals (Docket No. 71).  In response to an order of Court (Docket No. 73), Respondent filed a supplement to this response on April 13, 2009 (Docket No. 76), to which he attached the records from Petitioner's most recent PCRA petition.[11]

During the time that the case was statistically closed, the following occurred.  On June 29, 2005, Petitioner filed a second PCRA petition in the Court of Common Pleas of Butler County.  In it, he presented the following claims: 1) the prosecution suppressed, withheld and interfered with his access to the 911 tape which is exculpatory evidence and denied him a fair trial; 2) the government interfered with his right to prove that jury tampering concerning the jury's receipt of information about his criminal record occurred <u>before</u> the verdict of guilt or innocence; 3) three other jurors had also lied about racial bias during the voir dire; 4) one of these jurors had also lied when he said he had not read pre-trial newspaper accounts about the case; 5) another juror had third-party contact with a Commonwealth witness who relayed prejudicial information; and 6) the jury had engaged in premature deliberations (Docket No. 76

---

[11]Finally (to complete the list of personnel changes), on August 4, 2009, Gregory Simatic of the Attorney General's Office entered his appearance on behalf of the Respondent (Docket No. 88) and Jennifer Buck moved to withdraw her appearance on August 10, 2009 (Docket No. 89).

Ex. A at 6, 13, 14, 25, 28, 32, 38, 41, 48, 53). On November 30, 2005, Judge Thomas J. Doerr

filed an opinion and notice of his intent to dismiss Petitioner's second PCRA petition without a

hearing as untimely (Docket No. 76 Ex. C). Petitioner did not respond and on February 1, 2006,

Judge Doerr dismissed the petition (Docket No. 76 Ex. D).

Petitioner filed an appeal in the Pennsylvania Superior Court, docketed at No. 455 WDA

2006. He filed a brief on September 5, 2006 and the Commonwealth filed its brief on November

6, 2006 (Docket No. 76 Exs. E, F). He raised the following issues:

> I. Did the lower court err by deeming all issues waived for failing to file a concise statement of matters complained of on appeal when such concise statement was timely filed under the prisoner mailbox rule?
>
> II. Did the PCRA court commit an error of law by dismissing Mr. Williams' PCRA petition as time barred without conducting a hearing and without appointing counsel when that petition raises claims of exculpatory evidence previously unknown to the petitioner which could not have been ascertained by due diligence as well as claims of governmental interference?
>
> A. Did the prosecution suppress, withhold and interfere with petitioner's access to the 911 tape–which is exculpatory evidence–and in doing so violate his right to a fair trial under the Pennsylvania and United States Constitutions?
>
> B. Was Pennsylvania Supreme Court's Opinion based on Unreliable Information as a Result of Prosecutorial Misconduct, Obstruction of Justice and Numerous Cover-Ups?
>
> C. Did Governmental Interference deny Petitioner the right to prove that jury tampering occurred before the verdict of guilt or innocence?
>
> D. Was the petitioner denied a fair trial by an impartial jury in violation of due process under the Pennsylvania and United States Constitutions?

(Docket No. 76 Ex. E at 4.)

On August 7, 2007, the Superior Court affirmed the PCRA court's dismissal of the

petition as untimely (Docket No. 76 Ex. G). In its opinion, the Superior Court disagreed with the

PCRA court and held that Petitioner had complied with Pennsylvania Rule of Appellate

Procedure 1925(b) in filing his concise statement of matters complained of on appeal and his

issues were not waived.[12]  However, the court held that the PCRA petition was untimely because

it had not been filed within a year of the date upon which Petitioner's judgment became final

(that is, by January 17, 1996), 42 Pa. C.S. § 9545(b), and that he failed to demonstrate that he

filed it within 60 days of the date interference by government officials prevented him from doing

so or the facts became known to him and could not have been ascertained previously,

§ 9545(b)(1)(i)(ii), (2).

Specifically, the court held that: 1) Petitioner's claim that the Commonwealth

intentionally suppressed a 911 tape that tended to exculpate him had been raised and disposed of

in his first PCRA petition; 2) his claim that the prosecution obstructed justice during his direct

appeal of his death sentence was belied by the fact that the Supreme Court had reversed his death

sentence in 1987; 3) his claim that the Commonwealth covered up the fact that the jury had been

tampered with when it was provided information about his criminal record had been adjudicated

and remedied by the Supreme Court in 1987 and the claim that the Commonwealth was

somehow responsible for the tainting of the jury had been disposed of in his first PCRA petition;

and 4) the affidavits he submitted did not contain facts previously unknown to him that he could

not have ascertained with the exercise of due diligence and/or they did not prove that a juror

failed to answer honestly a material question on voir dire and that a correct response would have

_____

[12]The PCRA court had concluded that Petitioner failed to comply with the Rule 1925(b)
order because he did not file a concise statement of matters complained of on appeal by March
17, 2006, but the Superior Court concluded that, applying the prisoner mailbox rule, his
statement, which was postmarked March 15, 2006, was timely.  (Docket No. 76 Ex. G at 12.)

provided a valid basis for a challenge for cause.  (Docket No. 76 Ex. G at 15-18.)

First, the two Montgomery affidavits (written in 1985 and 1988) and Hayes affidavit (also written in 1988) were all in existence prior to January 17, 1996 and therefore by definition they did not present new facts.  (Id. at 19-21.)  Thomas Baughman, a former co-worker of Juror Paul Bowser, stated in an affidavit dated April 22, 2005 that he had worked with Bowser for eight years and that he heard Bowser make racial remarks,[13] but Petitioner offered no reason why he could not have obtained Baughman's statement earlier.  (Docket No. 76 Ex. G at 21-22.)  Trial witness Sallie Lane stated in an affidavit dated April 25, 2005 (Docket No. 52 Ex. L) that she heard one male juror make a racial remark to another male juror in the courthouse parking lot one day after proceedings had commenced and also that she responded to a female juror's question by stating that she (Lane) thought the Williams brothers were guilty because they stored guns at her house (contrary to her trial testimony that all they stored at her house was clothes), but Petitioner offered no explanation for why it took him 20 years to obtain Lane's affidavit. (Docket No. 76 Ex. G at 22-23.)

Jeffrey Lake, a former co-worker of Juror Robert Hancheck, stated in an affidavit dated April 27, 2005 that he had worked with Hancheck for four years and that Hancheck gave him the impression that he harbored racial animus toward him because he would "talk down" to him, "belittle" him and "would avoid[] having to shower close to [him]."  (Docket No. 52 Ex. G.) However, Petitioner offered no excuse for failing to present Lake's affidavit in his first PCRA petition in 1994, although the petition asserted allegations of juror bias and the affidavit did not

---

[13]Baughman reported that he had befriended a black man named Jeff Lake and that when Lake would ask Bowser to tell Baughman he wanted to talk to him, Bowser would say "Hey, your nigger buddy came looking for you."  (Docket No. 52 Ex. F.)

uncover "facts" proving that Hancheck lied on voir dire, but instead relied only on inferences and it was equally likely that Hancheck did not like Lake for reasons unrelated to race.  (Docket No. 76 Ex. G at 23-24.)  Eric Cook, who also worked with Hancheck, stated in an affidavit dated April 27, 2005 that he had a discussion with a third party in 2004 and that the third party "said something about there being a [Ku Klux] Klan meeting on Robert Hancheck's farm though he did not mention when this occurred" and that "[t]here were several incidents where I had a conversation where he would complain about blacks getting benefits and he would use the term 'nigger' to refer to them."  (Docket No. 52 Ex. H.)  However, the court found that the testimony about a Klan meeting was inadmissible hearsay and that a fair reading of the second item suggested that it was the third-party declarant (and not Hancheck) who used the offensive racial slur.  (Docket No. 76 Ex. G at 24-25.)

Richard Goldinger served as trial counsel for Petitioner's brother Raymond.  In a March 28, 2005 affidavit, Attorney Goldinger stated that he had a discussion with Juror Montgomery following the sentencing and that she told him she had been called a "nigger lover," that the jurors had been discussing the rumor that Petitioner had murdered someone in Detroit, and that Alternate Juror Gary Archer was not properly sequestered from the jury and was permitted to taint the jury pool with information he had learned from a third-party law enforcement official during the course of the proceedings.  (Docket No. 52 Ex. A.)  However, the court noted that Attorney Goldinger was clearly aware of these facts at the time of the trial and Petitioner offered no reason for failing to take this affidavit for twenty years.  (Docket No. 76 Ex. G at 25-26.)

Finally, Petitioner proffered the April 29, 2005 affidavit of Marc Caudel, an investigator with the Federal Public Defender's Office, following his interviews with every living member of

the jury.[14]  Caudel reported that, although the jurors denied making racial remarks themselves, three of them (Francis Geisler, Robert Hancheck and Bruce Heim) admitted either that such comments might have been made by others or that if such remarks had been made, they would not have left a lasting impression because such language was very common in Butler at that time. In addition, during his interview, Juror Geisler blurted out that he "didn't know what to call" blacks and admitted (in a seeming contradiction to his testimony at voir dire) that he had read articles about the shooting, Juror Judy Chilleo admitted that one juror tried to sway the jury into voting guilty from day one, and Juror Bowser admitted that he had gone to lunch with Alternate Juror Archer and that Archer told him he was convinced the Williams brothers were guilty.

The Superior Court found that Geisler's statement did not clarify whether he read newspaper articles before or after the trial but in any event, numerous potential jurors admitted during voir dire to reading articles or headlines about the shooting, but none of them was challenged for cause.  As for Geisler's alleged comments to Caudel about not knowing what to call blacks, they did not demonstrate that he lied on voir dire.  Chilleo did not admit to hearing any racially insensitive remarks during the trial, nor did Bowser, Hancheck or Heim.  Finally, the court held that Bowser's admission that he discussed Williams's guilt over lunch one day with Archer was not "previously unascertainable" information.  (Docket No. 76 Ex. G at 26-30.)

<u>Proposed Claims in Amendment to Petition</u>

Petitioner seeks to amend the petition to add the following claims:

<u>RONALD WILLIAMS' SIXTH AMENDMENT RIGHT TO TRIAL BY AN
IMPARTIAL JURY WAS VIOLATED</u>

---

[14]Juror Thomas Broad and Alternate Juror Charlotte Niggle had predeceased the investigation.  (Docket No. 52 Ex. E at 1.)

A.    <u>Multiple Jurors Lied During Voir Dire</u>.

    1.    Jurors Robert Hancheck, Paul Bowser and Francis Geisler lied during voir dire about racial bias.

    2.    Juror Geisler lied during voir dire about reading pretrial news accounts of the case.

B.    <u>Two Jurors Received Prejudicial Extra-Record Information</u>.

    1.    A juror received prejudicial extra-record information from a third party who was a Commonwealth witness.

    2.    Juror Geisler received prejudicial extra-record information from highly inflammatory pretrial newspaper accounts.

C.    <u>Multiple Jurors Improperly Engaged in Intra-Jury Misconduct (Premature Deliberations)</u>.

(Docket No. 52 at 12, 18, 19, 24, 33.)  The fifth claim includes several components: 1) Juror Bowser spoke to Alternate Juror Archer during the trial concerning Petitioner's guilt; 2) trial witness Sallie Lane heard jurors discussing the merits of the case in the parking lot during the trial; and 3) Lane overheard one juror say "the one nigger is guilty but I'm not sure about the other one."  (<u>Id.</u> at 34.)  Petitioner argues that the amendment is timely under the alternative statute of limitations for filing habeas corpus petitions in 28 U.S.C. § 2244(d)(1)(D) and/or because it relates back under Federal Rule of Civil Procedure 15(c).

    <u>Scope of the Hearing and Law of the Case</u>

    Under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. §§ 2241-54 (AEDPA), no appeal may be taken from the final order in a habeas corpus proceeding unless a certificate of appealability has issued, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right, and the certificate of appealability shall indicate which specific issue or issues satisfy this showing.  28

12

U.S.C. § 2253(c).  See Slack v. McDaniel, 529 U.S. 473, 483-84 (2000); Lambert v. Blackwell, 387 F.3d 210, 230 (3d Cir. 2004).  Thus, when the Court of Appeals issues a certificate of appealability as to a specific issue or specific issues and remands the case, the other claims originally asserted in the habeas corpus petition (which were dismissed or denied by the district court) may no longer be addressed.

In this case, the certificate of appealability was issued in order to address the question of whether Petitioner was denied due process in violation of the Fourteenth Amendment or a fair trial or impartial jury in violation of the Sixth Amendment because (1) jurors were disingenuous on voir dire in answering questions about racial bias; or (2) is this a rare case which is an exception to the "no-impeachment rule"?  Thus, Petitioner could not utilize a motion to amend to raise any of the other claims asserted in his original petition which this Court denied (on the merits or based upon a procedural reason) and as to which the Court of Appeals did not grant a certificate of appealability.  Upon review, it does not appear that any of the five proposed claims fall into this category.[15]

The Court of Appeals has held that:

Under the mandate rule, a species of the law of the case doctrine, "a trial court must comply strictly with the mandate directed to it by the reviewing court." Ratay v. Lincoln Nat. Life Ins. Co., 405 F.2d 286, 288 (3d Cir. 1968). Nonetheless, "[a] district court may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." In re Chambers Dev. Co., Inc., 148 F.3d 214, 225 (3d Cir. 1998) (internal quotation marks omitted); see also, e.g., Casey v. Planned Parenthood of Southeastern Pa., 14 F.3d 848, 857 (3d Cir. 1994).

---

[15]It is noted that Petitioner does not attempt to assert the claim that the prosecution withheld the 911 transcript, as he did in his second PCRA petition.  This claim was raised in the original petition and was denied on the merits and the Court of Appeals did not grant a certificate of appealability with respect to it.  Thus, it could not be raised again.

13

Sketvedt v. E.I. DuPont de Nemours & Co., 372 F.3d 193, 203 n.13 (3d Cir. 2004).  The mandate in this case directed this Court to hold "an evidentiary hearing at which Williams has the opportunity to make the showing mandated by McDonough."  Williams, 343 F.3d at 239.

Respondent focuses on a statement at the beginning of the decision in which the Court of Appeals states that it was "remand[ing] for an evidentiary hearing at which Williams will have the opportunity to introduce the improperly excluded evidence and to attempt to prove that a juror lied during voir dire."  Id. at 225.  Respondent notes that the Court of Appeals said "a juror," not multiple jurors.  However, the opinion carefully distinguishes between the evidence submitted by a former juror and the evidence submitted by Jewel Hayes, a trial witness.  The Court of Appeals did not hold that Petitioner would be barred from introducing evidence that other jurors lied during voir dire, although the opinion recognizes that such evidence might be precluded by some other doctrine such as the no-impeachment rule.  Thus, the mandate of the Court of Appeals does not preclude Petitioner from amending his petition.

Respondent contends that the motion to amend should be denied because the scope of this Court's hearing has been determined by the Court of Appeals and that to expand the scope of the hearing would violate the "law of the case."  However, the law of the case only bars reconsideration of arguments already presented.  Waldorf v. Shuta, 142 F.3d 601, 616 n.4 (3d Cir. 1998).  Of the five potential claims, only one of them potentially presents this issue.

As part of claim number five regarding "premature deliberations," Petitioner may be attempting to relitigate whether Juror Bowser received external information about the Williams brothers' other crimes from Alternate Juror Archer, who allegedly received it from a Zelienople police officer.  The Pennsylvania courts determined that this occurred after the guilt-phase of the

trial had concluded and granted Petitioner relief in the form of reducing his sentence from death

to life imprisonment.  This Court determined that this was as much relief as Petitioner was

entitled to receive and the Court of Appeals affirmed on this issue.  Williams, 343 F.3d at 235.

That is the law of this case and Petitioner cannot relitigate this issue by arguing that the jury

actually received this information earlier, as Attorney Goldinger appears to suggest in his 2005

affidavit.[16]  The law of the case precludes Petitioner from amending the petition to include this

claim, no matter what evidence he now relies upon to present it.

However, the Court of Appeals was not asked to and did not decide whether Juror Geisler

lied during voir dire about reading pretrial news accounts of the case, whether multiple jurors

improperly engaged in premature deliberations, or whether Jurors Hancheck, Bowser and Geisler

lied during voir dire about racial bias.  Thus, these potential claims are not precluded by the law

of the case doctrine.

Successive Petition Doctrine

Respondent also contends that Petitioner's motion to amend constitutes an attempt to

avoid the successive petition doctrine, which provides that permission must be sought from the

Court of Appeals when a petitioner seeks to file a second or successive petition.  28 U.S.C.

§ 2244(b).  However, this is not a second or successive petition and Respondent has not

---

[16]Allowing further pursuit of this claim would also be especially inappropriate because: 1) to the extent that Attorney Goldinger states that Juror Montgomery told him that Bowser received information from Archer prior to the verdict, such a statement would conflict with Montgomery's own 1985 affidavit, in which she stated that Bowser received the information from Archer prior to sentencing (Docket No. 52 Ex. B); 2) Montgomery had testified (along with other jurors and a newspaper reporter) at a post-trial hearing in 1985 and the trial court concluded, based on this testimony, that the information reached the jury after the guilt-phase of the trial; 3) Montgomery testified to the same effect at a PCRA hearing in 1995; and 4) Montgomery died in 1996.  Williams, 343 F.3d at 226, 227.

supported its contention that it should be treated as one.  Rather, Petitioner's motion seeks to amend an open, currently pending petition and § 2244(b) does not represent the appropriate standard.  Moreover, as discussed below, the Supreme Court has set forth the legal standard to apply regarding amending habeas corpus petitions and therefore the Court need not consider an analogy to the successive petition situation.

Timeliness and Motion to Amend Standard

Finally, Respondent contends that Petitioner's request to amend should be denied because the claims are untimely.  Petitioner argues that his motion to amend is timely pursuant to § 2244(d)(1)(D), which provides a petitioner may file a petition within "[o]ne year from the date on which the factual predicate of a claim or claims presented could have been discovered through the exercise of due diligence."  Petitioner contends that the information about Juror Hancheck was discovered on August 11, 2004 and April 27, 2005, that the information about Juror Bowser was discovered on April 22, 2005 and that the information about Juror Geisler was discovered on August 7, 2004.  The motion to amend was filed on April 29, 2005.

However, the cited statute concerns newly filed petitions, not motions to amend previously filed petitions.  As noted above with respect to Respondent's successive petition argument, the Supreme Court has set forth the legal standard to apply regarding amending habeas corpus petitions and therefore the Court need not consider an analogy to another doctrine.

Specifically, the Supreme Court has held that a habeas corpus petition may be amended when the new claim "arose out of the conduct, transaction, or occurrence set forth in the original pleading," Fed.R.Civ.P. 15(c)(2), and that "the claims added by amendment [must] arise from the same core facts as the timely filed claims, and not when the new claims depend upon events

16

separate in 'both time and type' from the originally raised episodes." Mayle v. Felix, 545 U.S. 644, 657 (2005).  Thus, in that case, when the original petition raised a claim arising out of the police pretrial interrogation of a witness pursuant to the Sixth Amendment and the amended petition attempted to raise a claim regarding Felix's own interrogation pursuant to the Fifth Amendment, the claims differed in time and type and amendment was not permitted.  See also Hodge v. United States, 554 F.3d 372, 378 (3d Cir. 2009) (newly asserted ineffective assistance of counsel claim did not differ in time and type from previously asserted right-to-appeal claim, because both concerned erroneous advice that Hodge's counsel provided about the filing deadline for the appeal).

In this case, claim number one, which asserts that Jurors Hancheck, Bowser and Geisler lied on voir dire about racial bias, is of the same type as the timely filed claim in the original petition concerning Juror Number Two and it arose at the same time (that is, during voir dire). Similarly, claim number two, which asserts that Juror Geisler lied on voir dire when he stated that he had not read newspaper accounts prior to the trial is of the same time and type as the claim regarding Juror Number Two.  The other three claims do not meet these criteria.

Claim number three is that "a female juror" (who is unidentified) was exposed to an external influence when, at some point during the trial, trial witness Sallie Lane told her that she (Lane) knew that the Williams brothers kept guns at her apartment.  Petitioner contends that this statement introduced evidence not presented at trial.[17]  However, this claim did not arise at the same time as Petitioner's claim concerning juror bias during voir dire and thus the petition may

---

[17]At trial, Lane had testified that Petitioner kept only clothing at her apartment.  (Docket No. 52 Ex. K at 435.)

not be amended to include it now.  Moreover, Lane's statement would not be specific enough to act upon even if the petitioner were amended to include this claim: Lane does not identify who the female juror was.

Claim number four is that Juror Geisler read highly inflammatory newspaper accounts prior to the trial.  However, to the extent that Petitioner intends to advance a different claim from claim number two (that Geisler lied on voir dire when he said he had not read articles prior to the trial), it did not arise at the same time as Petitioner's claim regarding juror bias during voir dire.  Moreover, as discussed below, contrary to Petitioner's assertion, Geisler's statement does not present a direct conflict with his voir dire testimony and Petitioner should not be permitted to use it to impeach Geisler in this manner.

Claim number five is that that jury engaged in "premature deliberations," specifically that Juror Bowser admitted discussing the merits of the case with Alternate Juror Archer at lunch during the trial[18] and that Sallie Lane overhead one male juror tell another in the parking lot during the trial that he was sure one defendant was guilty but was not sure about the other one.  These claims are not of the same time and type as the claim regarding racial bias by Juror Number Two and the petition should not be amended to include them.  In addition, as noted above, Lane does not provide sufficient information in any event: she does not identify either of the male jurors and the male juror's alleged comment was that one defendant was guilty but he was not sure about the other.  This statement does not identify which defendant was being

---

[18]As noted above, to the extent the claim of premature deliberations is based on Archer relaying information to Bowser regarding other crimes by the Williams brothers, the state courts have concluded that this occurred after the guilt phase of the trial had ended, this Court and the Court of Appeals have affirmed and this represents the law of the case.

referred to.  It could be that the juror had concluded that Raymond was guilty but was open to further consideration about Petitioner and thus the statement would not be problematic.

Thus, only claims one and two could be made amendments to the petition under the law as set forth in <u>Mayle v. Felix</u>.  Nevertheless, amendment should not be permitted for the reasons that follow.

<u>Claim Number Two</u>

Claim number two asserts that Juror Geisler lied during voir dire when he stated that he had not read newspaper accounts of the case prior to the trial.  The evidence Petitioner advances to support this claim is that, in 2004, Investigator Caudel was speaking to Geisler and the following occurred:

> Mr. Geisler said that he was not a racist and that he did not even know that the two defendants were black until he was called in for jury duty and saw them in the courtroom.  I, at that time, told him that there were several pictures of them in the Butler Eagle Newspaper and asked him if he had seen them in the paper.  His reply was that he "read all of the articles and never saw any pictures of the defendants in them."  Upon returning to my office, I reviewed the transcript of the voir dire, particularly Mr. Geisler's testimony.  I noted that, when asked if he had seen the articles in the Butler Eagle Newspaper, he denied ever reading any of them due to the fact that he had been in the hospital.

(Docket No. 52 Ex. E at 2.)

Juror Bowser's purported admission that he read newspaper articles about the case prior to the trial, seemingly at odds with his voir dire testimony,[19] does not present an issue for purposes of the hearing.  First, the statement by itself does not present the contradiction Petitioner contends it does.  As the Superior Court noted, Bowser might have read the articles after the trial and in any event, Petitioner offers no support for the contention that Bowser's

---

[19]Docket No. 52 Ex. J at 93, 95.

informal statement to an investigator twenty years after the trial can be used to impeach his testimony on voir dire, given under oath in court and much closer to the time of the events in question.[20]

Indeed, Caudel did not ask Bowser to consider his prior statement that he had not read articles prior to the trial, nor did Caudel ask Bowser whether he felt he still had been impartial for purposes of the case even though he had read such articles. During the voir dire, although jurors who stated that they could not remain impartial were stricken, those who indicated that they could remain impartial were not stricken for cause, although some of them were stricken on peremptory challenges. In fact, four of the jurors and two of the alternates who sat on this case indicated that they had read articles about the case.

The Supreme Court has held that, "to receive a new trial because of errors during voir dire, [a defendant] 'must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that the correct response would have provided a basis for a challenge for cause.'" United States v. Hodge, 321 F.3d 429, 441 (3d Cir. 2003) (quoting McDonough, 464 U.S. at 556). "The standard with regard to extraneous information is that '[a] new trial is warranted if the defendant likely suffered "substantial prejudice" as a result of the jury's exposure to the extraneous information." Id. (quoting United States v. Lloyd, 269 F.3d 228, 238 (3d Cir. 2001)). Petitioner has provided no basis for concluding that, had Bowser stated that he had read the articles prior to trial, the statement alone would have provided a challenge for cause or that he was likely subjected to substantial prejudice as a result of the

---

[20]In addition, as a court recently noted, a defense investigator's affidavit of what the juror said is likely inadmissible as hearsay. United States v. Benally, 546 F.3d 1230, 1234 n.1 (10th Cir. 2008).

jury's exposure through Bowser to the extraneous information contained in the newspaper accounts when other jurors had read these same accounts.

Claim Number One

In claim number one, Petitioner asserts that Jurors Bowser, Hancheck and Geisler lied during voir dire when they stated that they harbored no racial bias.  To support this claim, Petitioner cites three pieces of evidence: 1) in 2005, Investigator Caudel spoke to the jurors and learned from Jurors Geisler, Hancheck and Heim that racial comments might have been made or that they were common in Butler at the time; 2) during his interview, Geisler blurted out that he did not know what to call blacks; and 3) former co-workers of Bowser and Hancheck told Caudel that these two men had made racial comments at the workplace.  This evidence is insufficient to justify a hearing on Petitioner's claim.

As an initial matter, Petitioner cites no authority–and this Court is aware of none–that would authorize the actions he took in this case: twenty years after the trial, he hired an investigator to interview the members of the jury, trial witness Sallie Lane and former co-workers of the jurors n an attempt to discover whether any of the jurors displayed racial bias. Although no specific authority appears to prohibit such a practice, it is clearly not in keeping with the spirit of Tanner, in which the Supreme Court noted that "[s]ubstantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict," 483 U.S. at 119.  The Court stated that:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.

21

> See, e.g., <u>Government of Virgin Islands v. Nicholas</u>, [759 F.2d 1073,] 1081 [(3d Cir. 1985)] (one year and eight months after verdict rendered, juror alleged that hearing difficulties affected his understanding of the evidence). Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct. <u>See</u> <u>Note, Public Disclosures of Jury Deliberations</u>, 96 Harv.L.Rev. 886, 888-892 (1983).

<u>Id.</u> at 120-21.  The Court concluded as follows:

> As described above, long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry. Petitioners' Sixth Amendment interests in an unimpaired jury, on the other hand, are protected by several aspects of the trial process. The suitability of an individual for the responsibility of jury service, of course, is examined during <u>voir dire</u>. Moreover, during the trial the jury is observable by the court, by counsel, and by court personnel. <u>See</u> <u>United States v. Provenzano</u>, 620 F.2d 985, 996-997 (CA3 1980) (marshal discovered sequestered juror smoking marijuana during early morning hours). Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court <u>before</u> they render a verdict. <u>See</u> <u>Lee v. United States</u>, 454 A.2d 770 (DC App.1982), <u>cert. denied sub nom. McIlwain v. United States</u>, 464 U.S. 972, 104 S.Ct. 409, 78 L.Ed.2d 349 (1983) (on second day of deliberations, jurors sent judge a note suggesting that foreperson was incapacitated). Finally, after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct. <u>See</u> <u>United States v. Taliaferro</u>, 558 F.2d 724, 725-726 (CA4 1977) (court considered records of club where jurors dined, and testimony of marshal who accompanied jurors, to determine whether jurors were intoxicated during deliberations).

<u>Id.</u> at 127.  At no point did the Court envision a defendant having unlimited permission to interview jurors or others in search of juror misconduct.  Among the public policies behind the "no-impeachment rule" is "promoting verdict finality."  <u>Government of the Virgin Islands v. Gereau</u>, 523 F.2d 140, 148 (3d Cir. 1975).  <u>See</u> <u>United States v. Lakhani</u>, 480 F.3d 171, 185 (3d Cir. 2007) (precluding defendant from attempting to impeach verdict using jurors' comments, given several months after the trial on a radio program, in which one juror essentially admitted that she was coerced into voting guilty).

The Court of Appeals for the Third Circuit, citing authority from another court, has stated that:

> We are always reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.' As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.

United States v. Gilsenan, 949 F.2d 90, 97 (3d Cir. 1991) (quoting United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989) (citations omitted).  The court further stated that:

> Jurors who complete their service should rarely, if at all, be recalled for proceedings such as those appellants propose here. It is qualitatively a different thing to conduct a voir dire during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose.

Id. at 98.  See also United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983) (post-trial investigations are not an opportunity for a convicted defendant to "conduct a fishing expedition," but are appropriate only where "there is clear, strong, substantial and incontrovertible evidence that specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.")

The Court of Appeals remanded the case to this Court with a directive to hold an evidentiary hearing at which Jewel Hayes would testify (or her affidavit would be admitted into evidence).  The holding certainly permits Respondent to present evidence from Juror Number Two to attempt to rebut the allegations Hayes makes regarding him.  However, this court does not believe that the circuit Court authorized Petitioner to conduct this investigation long after the trial ended and seek to introduce evidence from multiple jurors and other witnesses as to racial bias by the jurors.

The No-Impeachment Rule

The Court of Appeals rejected Petitioner's argument that Juror Montgomery's affidavit reporting racial comments by other jurors during deliberations would fall outside the "no-impeachment rule" merely because it concerned the matter of jurors lying during voir dire.  In addition, the court noted that, if Montgomery was saying (it was unclear) that the comments were made prior to deliberations, it was not "clearly established" that states had to admit such testimony as an exception to the "no-impeachment rule" since such a practice would raise the same concerns as making inquiries into the decision-making process itself and would create the potential for the very sort of problems that the rule was designed to prevent, including post-trial harassment of jurors in the hope that one will recount a remark by a fellow juror that construed as evidence that this juror had lied during voir dire.  Finally, the court observed that Petitioner's argument that evidence of racial bias should be excepted from the "no-impeachment rule" because it represents outside influence presented multiple problems: first, he never squarely presented this argument to the state courts and therefore it appeared to be procedurally defaulted, second there was no "clearly established" Supreme Court law supporting it, but only dicta from a Ninth Circuit case that post-dated the state court decisions in Petitioner's PCRA appeal. Williams, 343 F.3d at 235-39.

Relying on Williams, the Court of Appeals for the Tenth Circuit recently stated that:

> allowing juror testimony through the backdoor of a voir dire challenge risks swallowing the rule. A broad question during voir dire could then justify the admission of any number of jury statements that would now be re-characterized as challenges to voir dire rather than challenges to the verdict. Given the importance that Rule 606(b) places on protecting jury deliberations from judicial review, we cannot read it to justify as large a loophole as [the defendant] requests.

United States v. Benally, 546 F.3d 1230, 1236 (10th Cir. 2008).  In Benally, the court held that

24

the district court erred in admitting a juror's affidavit about other jurors' racist statements about Native Americans to impeach the verdict.  The court held that the proffered testimony was barred by Rule 606(b); that the testimony could not be offered to show that the jurors lied on voir dire when they stated that they had no negative experiences with Native Americans and that the fact that Benally was a Native American would not affect their evaluation of the case because the point of admitting the testimony was not to charge the jurors with contempt but to support a motion to vacate the verdict; that the testimony did not constitute "extra-record facts relating to the defendant" such that it would fall within an enumerated exception to the rule; that implying an exception to the rule for evidence touching on racial bias was inappropriate given that Congress had considered and specifically rejected a version of Rule 606(b) that would have allowed jurors to testify on juror conduct during deliberations; and that Rule 606(b) is not unconstitutional as applied to testimony that would support a claim of a Sixth Amendment violation based on <u>Tanner</u> and the impossibility of limiting such a conclusion to evidence of racial bias as opposed to other types of juror misconduct.

This Court concludes that Petitioner cannot present the statements of former jurors–or the affidavit of an investigator from the Federal Public Defender's Office who interviewed the jurors–with respect to proposed evidence regarding what occurred during deliberations for the same reason he could not present the affidavit of Juror Montgomery, namely the no-impeachment rule precludes them.  Federal Rule of Evidence 606(b) specifically states that a juror's "affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying [may not] be received for these purposes."  <u>See</u> <u>Benally</u>, 546 F.3d at 1234 (refusing to admit investigator's affidavit of what one juror said regarding racial comments

25

by another juror).

Thus, the statements by Jurors Geisler, Hancheck and Heim, as reported by Investigator Caudel, that racial comments might have been made by others or that if such remarks had been made, they would not have left a lasting impression because such language was very common in Butler at that time are not admissible.  In addition, none of the statements indicates who on the jury made these statements, if they were made at all.[21]

Petitioner argues that there is a difference between a federal habeas court reviewing the holdings of a state court regarding juror bias (that is, state courts act constitutionally when they exclude evidence of juror bias under the no-impeachment rule) and the federal habeas court handling an issue of juror bias in the first instance.  He suggests that the no-impeachment rule may not apply because the Court of Appeals indicated that "we do not hold that testimony of the type at issue in this case is inadmissible under Rule 606(b) or any other particular version of the 'no impeachment' rule."  Williams, 343 F.3d at 237.  However, the Court of Appeals recognized that "Federal Rule of Evidence 606(b) applies in evidentiary hearings held in federal court under 28 U.S.C. § 2254...."  Id. at 230 n.3 (citing Fed.R.Evid. 1101(e); Gosier v. Welborn, 175 F.3d 504, 511 (7th Cir. 1999)).  Thus, in the evidentiary hearing to be held in this case, Federal Rule of Evidence 606(b) will apply and Petitioner will not be permitted to introduce testimony or affidavits by former jurors or investigators who spoke to such jurors as to racial bias by other jurors during the deliberations in an attempt to impeach the verdict.

---

[21]Remarkably, the motion to amend states that the jurors identified Juror Geisler as the individual "most likely" to have uttered racial remarks (Docket No. 52 at 32-33), but Investigator Caudel's affidavit refers only to an "older male juror who was loud and obnoxious" (Docket No. 52 Ex. E at 3) without identifying this juror.

26

To the extent Petitioner is arguing that he has evidence of racial comments by the jurors that occurred <u>prior to</u> the deliberations, he has not supported it.  Rather, he has merely proffered the affidavit of an investigator who spoke to the jurors twenty years after the trial, showed them the Montgomery affidavit (which the Court of Appeals noted "did not pin down exactly when the alleged statements were made," 343 F.3d at 236) and obtained the following statements: 1) Juror Geisler stated that racial comments "might have been said but since the type of language was so common he would not remember the comments because this would not have made an impression on him"; 2) Juror Hancheck "denied ever hearing them.  However, he did say that these types of comments were so common that, if they had been made, he would not have remembered them."; 3) Juror Heim "denied hearing them made.  He went on to say that this type of language would not have surprised him since it was very common in Butler at that time." (Docket No. 52 Ex. E at 1, 3.)  None of these statements affirmatively asserts that racial comments were made at all, much less that they were made prior to the deliberations.[22]

Finally, to the extent Petitioner is arguing that jurors may testify as to racial comments by other jurors as an exception to the no-impeachment rule because it represents an outside influence, the Court of Appeals has already noted that this argument (as advanced with respect to Juror Montgomery's affidavit) was procedurally defaulted because Petitioner had not presented it to the state courts in his first PCRA petition.  More significantly, Petitioner attempted to raise

---

[22]Similarly, although not advanced as an independent claim, Investigator Caudel's report of Juror Chilleo's statement that one juror tried to sway the jury into voting guilty from day one (Docket No. 52 Ex. E at 2) could not be admitted for the same reason.  <u>See</u> <u>Government of the</u> <u>Virgin Islands v. Gereau</u>, 523 F.2d 140, 150 (3d Cir. 1975) ("intimidation or harassment or one juror by another" is an example of evidence that is not competent to impeach a verdict).  In addition, Juror Chilleo did not identify the juror and thus the information is not specific enough to act upon.

the argument with respect to the evidence submitted by Jurors Geisler, Hancheck and Heim (through Investigator Caudel) in his second PCRA petition and the PCRA court and the Superior Court concluded that his petition was untimely under 42 Pa. C.S. § 9545(b)(1). Thus, the state courts rejected the argument based upon an independent and adequate procedural rule. See Bronshtein v. Horn, 404 F.3d 700, 708 (3d Cir. 2005) (recognizing that § 9545(b)(1) operates as an absolute jurisdictional bar to hearing the merits of a late PCRA petition). This Court may not proceed to address this argument on the merits because it is procedurally defaulted and he has not even attempted to establish "cause" for this procedural default, that he suffered "prejudice" therefrom, or in the alternative that he will suffer a "fundamental miscarriage of justice" if these claims are not heard. Moreover, he would not meet the standard necessary to satisfy either exception to the procedural default bar in any event.

The issue of cause "ordinarily turn[s] on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Because Petitioner's counsel did not raise these issues or raised them inadequately, he cannot refer to any source external to the defense. Thus, he cannot establish the existence of "cause" to excuse the procedural default.

The other exception to procedural default is established when a petitioner demonstrates that failure to hear a claim would result in a miscarriage of justice. Sawyer v. Whitley, 505 U.S. 333, 339 (1992). A fundamental miscarriage of justice occurs when a constitutional violation has probably resulted in the conviction of one who is actually innocent. Murray, 477 U.S. at 495-96; Hull v. Freeman, 991 F.2d 86, 91 n.3 (3d Cir. 1993). To meet this standard, the prisoner must show a fair probability that, in light of all the evidence, including that claimed to have been

28

illegally admitted and that claimed to have been wrongly excluded or which became available only after trial, the trier of fact would have entertained a reasonable doubt of his guilt.  Sawyer, 505 U.S. at 339 n. 5 (citing Kuhlmann v. Wilson, 477 U.S. 436, 454 n. 17 (1986)).  This exception is exceedingly narrow: "'To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial.'  Given the rarity of such evidence, 'in virtually every case, the allegation of actual innocence has been summarily rejected.'"  Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)).

In this case, Petitioner does not even claim that he is actually innocent of the crimes with which he was charged.  Thus, he can not meet the high burden of demonstrating a fundamental miscarriage of justice.  For these reasons, his argument that evidence by former jurors concerning racial bias on the jury is exempt from the "no-impeachment rule" is procedurally defaulted and this Court cannot consider it.

Petitioner's other evidence consists of the affidavits of three individuals: Thomas Baughman, who worked with Juror Bowser from 1990 to 1998; Jeffrey Lake, who worked for Juror Hancheck from 1994 to 1998; and Eric Cook, who related a discussion he had with a co-worker concerning Juror Hancheck in 2004.  Although Petitioner contends that this evidence resembles the evidence regarding Juror Number Two, there is a crucial difference.

Petitioner has not proffered evidence that Jurors Bowser and Hancheck were discussing Petitioner's trial with their co-workers and that, during these discussions, they stated that their verdict had been based on racial biases.  Rather, the proposed evidence is that these individuals reported examples of racial comments made by Bowser and Hancheck in the workplace that were completely unrelated to the trial.  Even if these former co-workers were permitted to testify

29

that Jurors Bowser and Hancheck exhibited racial bias at some time and in some place, these observations do not demonstrate that Jurors Bowser and Hancheck lied on voir dire in 1985 when they stated under oath that they could listen to and judge the testimony of a black person in the same fashion as the testimony of a white person, giving each its deserved credibility. Similarly, Juror Geisler's blurting out that he "didn't know what to call" blacks when he was interviewed in 2005 does not demonstrate that he lied on voir dire twenty years before. As noted above, the Federal Rules of Evidence apply in a hearing pursuant to § 2254, and they certainly require that evidence be relevant to the issue being argued, F.R.E. 401. If Juror Number Two uttered racial epithets immediately after the trial, he may have lied on voir dire when he said he could be fair and impartial. The same analysis cannot be applied to statements relayed by third parties twenty years after the trial about statements supposedly made by jurors five to ten years after the trial in a completely different context. In <u>Tanner</u>, the Supreme Court stated that, after the trial, a party may seek to impeach the verdict by non-juror evidence of misconduct. 483 U.S. at 127. However, the Court was clearly referring to misconduct that had occurred <u>during</u> the trial.

To allow these statements into evidence would be to assume that a statement by a third party relating any racial comment made by a juror at any time after a trial is admissible to demonstrate that the juror had lied on voir dire when assuring the court that he or she could be fair and impartial. Petitioner cites no authority for this sweeping proposition and the Court is unaware of any authority that would support it. No verdict would ever by final.

In addition, as the Superior Court noted in affirming the dismissal of Petitioner's second PCRA petition as untimely, the two proffered affidavits relating to Juror Hancheck are

30

insufficient to demonstrate even that he expressed racial bias at the workplace. Lake's affidavit relies on inferences and is equally susceptible to the reading that Hancheck did not like Lake for reasons unrelated to race. Cook's affidavit reports inadmissible hearsay and appears to suggest that it was the unknown third-party declarant and not Hancheck who made racial remarks. Thus, these affidavits do not even demonstrate that Hancheck exhibited racial bias in the 1990s, much less that he harbored such sentiments in 1985.

In conclusion, the issues that Petitioner wishes to add in his amended petition cannot be considered: claims three, four and five are not of the same time and type as the issue of racial bias by Juror Number Two; claim number two does not present a conflict with Juror Bowser's prior testimony on voir dire and even if he had stated that he read newspaper articles that would not have provided Petitioner with a challenge for cause; and claim number one relies upon evidence of testimony by former jurors regarding racial comments made during deliberations which would violate the no-impeachment rule (and Petitioner has procedurally defaulted the argument that such evidence constitutes an exception to the no-impeachment rule because it is an outside influence), Petitioner has not demonstrated that he has evidence that racial comments were made prior to the deliberations, and the testimony of co-workers of two jurors years after the trial about racial comments they made in the workplace is not relevant to demonstrate that these jurors lied on voir dire in the trial of this case. Therefore, the motion to amend will be denied.

An appropriate order follows.

_____
Lisa Pupo Lenihan

31

                                        United States Magistrate Judge

Dated: September 15, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RONALD A. WILLIAMS,                    )
           Petitioner,            )
                                  )
        vs.                        )          Civil Action No. 98-1320
                                  )
LOUIS FOLINO Superintendent, SCI-      )
GREENE,                                )
           Respondent.            )

ORDER

     AND NOW, this 15th  day of September, 2009,

     IT IS HEREBY ORDERED that Petitioner's motion for leave to amend the

petition for writ of habeas corpus (Docket No. 52) is denied.


                                 _____
                                 Lisa Pupo Lenihan
                                 United States Magistrate Judge